# United States Court of Federal Claims

No. 16-694 C
Filed Under Seal: January 28, 2019
Reissued: March 22, 2019

_____

**AMERICAN VANGUARD CORPORATION,**

      *Plaintiff*,

v.

**UNITED STATES OF AMERICA,**

      *Defendant.*

_____

*Barry M. Hartman*, Kirkpatrick & Lockhart, Washington, D.C., for plaintiff.

*Tara K. Hogan*, United States Department of Justice, Washington, D.C., for defendant.

## ORDER AND OPINION

**Hodges,** *Senior Judge.*

    Plaintiff American Vanguard Corporation filed this claim, alleging that a Stop Sale, Use, or Removal Order issued by the Environmental Protection Agency constituted an unconstitutional taking of its property. The alleged property is American's pentachloronitrobenzene (PCNB) business, including personal and intangible property used for manufacturing, selling, and/or distributing PCNB and PCNB-related products.

    Defendant filed a motion for summary judgment maintaining *inter alia* that plaintiff is not entitled to compensation for economic losses suffered as a result of congressionally authorized enforcement actions taken by the EPA. Plaintiff filed a partial motion for summary judgment in opposition, contending essentially that it had a cognizable Fifth Amendment property interest, and that the said property was "taken."

    For the reasons stated below, we find that plaintiff does not possess a cognizable property interest in the property allegedly taken. Plaintiff's complaint must be dismissed.

## BACKGROUND

Congress maintains a comprehensive legislative scheme regarding the regulation of pesticides and the EPA's approval of pesticide registrations. The Federal Insecticide, Fungicide, and Rodenticide Act provides that the EPA's approval of registrations is conditioned on a determination that a pesticide, including its use directions and composition, "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D). The Act defines "unreasonable adverse effects" as "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb).

Registration requires an applicant to disclose the "complete formula of the pesticide," including data related to certain impurities of toxicological significance, by submitting a form called a Confidential Statement Formula, or CSF.[1] 7 U.S.C. § 136a(c)(1)(D); 40 C.F.R. § 152.50(f). The form instructs the applicant to list impurities greater than or equal to 0.1% or impurities of lesser amount determined by the EPA to be of toxicological significance and to propose certified limits. 40 C.F.R. § 158.320(c), (d). Selling or distributing registered pesticide the composition of which differs at the time of its sale or distribution from its CSF description is unlawful. 7 U.S.C. § 136j(a)(1)(C).

The Act generally prohibits the sale or distribution of a pesticide product unless it is registered. 7 U.S.C. § 136a(a). To ensure compliance, the EPA may issue a "stop sale, use, or removal order" where "there is reason to believe that on the basis of inspections or tests" that a pesticide is in violation of the Act or has been or is intended to be distributed or sold in violation of its provisions. 7 U.S.C. § 136k(a). Such orders are to be issued only where the EPA has reason to believe that there is a potential hazard to human health or the environment or to address serious violations that present a threat of harm.

American manufactures, distributes, and sells a variety of agricultural and non-agricultural pesticide products, such as herbicides, insecticides, and fungicides, domestically and internationally. One of its product lines is based on an active ingredient known as PCNB, which has been registered with the EPA since 1985. PCNB is a fungicide that may be formulated into end-use products for terrestrial food crop and non-crop applications. American contends that these products prevent mold fungus growth on grass and are applied on various crops. It adds that effective application of the product must occur in October and November and that it is busiest in September and October.

---

[1] An "[i]mpurity associated with an active ingredient means: (1) Any impurity present in the technical grade of active ingredient; and (2) Any impurity which forms in the pesticide product through reactions between the active ingredient and any other component of the product or packaging of the product." 40 C.F.R. § 158.300.

American detected an impurity in its PCNB products in 1993 and informed the EPA. (ECF No. 49 at 16 (███████████████████████████).) EPA assigned the report internally for non-expedited review, but took no further action. Pursuant to section 136a–1 of the Act, which required the EPA to review older pesticides for compliance with current regulatory standards, the EPA completed its review of PCNB to determine whether the PCNB should be reregistered in 2006. EPA concluded that for most uses of PCNB, the adverse environmental effects outweighed the benefits of the uses. As a result, EPA found that PCNB was ineligible for reregistration; it did not initiate proceedings to cancel registrations, however.[2]

EPA in 2009 learned that Australian researchers and the Australian authority in charge of regulating pesticides revealed the presence of dioxins in PCNB products. EPA then requested that American provide samples of PCNB for analysis. The result of the analysis completed in January 2010 showed the presence of dioxin in the samples. EPA officials then met with plaintiff to discuss elimination of the PCNB impurities.[3] EPA's Office of Pesticide Programs referred the matter to the Office of Enforcement & Compliance in the summer of 2010 to determine if enforcement action was appropriate.

The Office of Enforcement & Compliance found that, based on the sample testing results, that adequate evidence that the PCNB products sold by plaintiff contained dioxin, an impurity of toxicological significance that was not identified on the CSF. During the review, they briefed the EPA's Director of the Waste and Chemical Enforcement Division (Ms. Kelley) and the Assistant Administrator for Enforcement's aide (Mr. Kushner). EPA issued a Stop Sale, Use, or Removal Order on August 2010, signed on behalf of Ms. Kelley by Mr. Lott, her deputy.

EPA's Order explained that a registrant may not sell or distribute a pesticide product with a composition that differs from the approved composition. It found that the CSF submitted by American had not identified the impurity and therefore had not reported adequately the composition of the product as required by 7 U.S.C. § 3 and 40 C.F.R. § 158.320. The EPA, as a result, ordered American to cease immediately the distribution, sale, or use of PCNB products that were in American's ownership, custody or control. Appx 5–6 (citing 7 U.S.C. § 136j(a)(1)(C)). The Order also required American to submit a written proposal for proper disposition of all violative PCNB products.

---

[2] EPA subsequently accepted American's voluntary request to amend their registrations and to terminate use PCNB for "[g]olf course roughs; residential sites including lawns, yards, and ornamental plants and gardens around homes and apartments; grounds around day care facilities; school yards; parks (except industrial parks); playgrounds; and athletic fields (except professional and college fields)." Pentachloronitrobenzene (PCNB); Amendments to Terminate Uses, 74 Fed. Reg. 34, 337 (July 15, 2009).

[3] The parties dispute the content of those discussions and whether the EPA informed American that it needed submit a revised CSF to identify the presence of the impurity.

American then sent a letter to EPA, wherein it requested that EPA lift its Order and signaled its willingness to submit a revised CSF, along with all necessary supporting data, if such an amendment would provide a sufficient basis for lifting the Order. (ECF No. 49-1 at 231–233 (claiming that the Order had effectively suspended American's licenses for PCNB products and that by not utilizing the normal procedures for suspending or cancelling registrations under the Act,[4] the EPA had not given American an opportunity to contest the Order or make adjustments in its registrations).) EPA disagreed with American's assertions that it was in compliance with the Act.

American filed a claim in late August 2010 in the District Court for the District of Columbia to enjoin the EPA Order. *See Am. Vanguard Corp. v. Jackson*, 803 F. Supp. 2d 8 (D.D.C. Aug. 17, 2011) (indicating that plaintiff had argued that Ms. Kelley lacked legal authority to issue the Order). The court found that the Order was in violation of the Administrative Procedures Act and vacated it. It ruled that the Order was issued illegally, as there was no evidence that the authority to issue such orders had been reassigned by the EPA from the Director of the Toxics and Pesticides Division to the Director of the Waste and Chemical Enforcement Division, Ms. Kelley. *Id.* at 14–16

American submitted an application to amend the registration of PCNB in September 2010, which included a revised CSF. The revised CSF identified the presence and concentration of the impurity and proposed an upper limit for the impurity. EPA approved plaintiff's amended registration for certain products/uses and authorized it to sell PCNB products in November 2011, after the court's ruling. American voluntarily discontinued certain uses of PCNB and resumed its domestic sale of PCNB products.

Thereafter, American filed this claim before our court, alleging that the EPA's Order was a violation of its Fifth Amendment right because it was a taking of private property without just compensation. It claims that it lost its PCBN business in the crop and turf sector and that it does not expect to recover that business for many years. American defines the taken property as its domestic PCNB business, which includes "manufacturing facilities and processes, technical know-how, intellectual property, customer lists, sales networks, distribution networks, product sales, and transferable licenses and registrations." Compl. 1. The Government filed a motion for summary

---

[4] To ensure that pesticides comply with the Act, American points out that the EPA Administrator may act in a variety of ways: (A) cancel a registration; (B) suspend the registration pending cancellation if there is an imminent hazard that exists during the cancellation proceedings; (C) seize certain pesticides for limited misbranding, adulteration, or similar conditions; (D) issue a stop sale, use, or removal order; or (E) impose civil and criminal penalties. (ECF No. 49 at 13.)

judgment.[5] Plaintiff submitted a cross-motion for partial summary judgment in response asking the court to find that a taking occurred and to proceed to trial on damages.

**STANDARD OF REVIEW**

The movant prevails on a Rule 56 summary judgment motion when it shows there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. Cross-motions for summary judgment are reviewed under the same standard. *Mingus Constructors, Inc., v. United States,* 812 F.2d 1387, 1391 (Fed. Cir. 1987).

**DISCUSSION**

The Government argues that American's complaint should be dismissed for three separate reasons: American is estopped from arguing that the Order was authorized government conduct, a necessary element of a cognizable taking claim, because it previously took the position that EPA's action lacked legal authority; American does not have a legally cognizable property interest; and American lacks the required reasonable investment-backed expectations to show that a regulatory taking occurred.

1. <u>Estoppel Defenses</u>

The Government contends that collateral estoppel bars American from claiming that the Order was an authorized action, a required element of a takings claim, at it argued before the district court that the Order was issued illegally. It further argues that judicial estoppel prevents American from arguing that such unauthorized action was ratified; it maintains that any acquiescence by the EPA after the Order was vacated is legally irrelevant, as there was no longer any agency action capable of being ratified. We disagree. We find that the Government has not established the elements of an estoppel defense and that the EPA Order was an authorized action for purposes of a takings claim.

The taking of property by an officer of the United States, without express or implied authorization by some act of Congress, is not the act of the Government; therefore, recovery is not available in the Court of Claims. *Reg'l Rail Reorganization Cases*, 419 U.S. 102, 127 n.16 (1974) (citation and quotations omitted); *Tabb Lakes, Ltd. v. United States*, 10 F.3d 796, 802 (Fed. Cir. 1993) (stating that a Tucker Act claim does not lie for an executive taking not authorized by Congress, expressly or by implication).

Collateral estoppel applies to prevent re-litigation of an issue of fact or law when the identical issue has been fully litigated and decided in a prior suit by the same party.

---

[5] The Government previously filed a motion to dismiss for failure to state a claim and lack of subject matter jurisdiction, which this court denied.

*United Access Techns., LLC v. Century Broadband Servs., LLC*, 778 F.3d 1327, 1331 (Fed. Cir. 2015). To apply the doctrine, a party must demonstrate that:

> (1) the previous determination was necessary to the decision; (2) the identical issue was previously litigated; (3) the issue was actually decided in a decision that was final, valid, and on the merits; and (4) the party being precluded from relitigating the issue was adequately represented in the previous action.

*Id.* (citations omitted).

Defendant has not established its estoppel defense because the issue previously litigated is not identical to the one before us. The issue here is whether the Order is authorized in terms of takings law; whereas, the parties litigated whether the official, Ms. Kelly, had the legal authority to issue the Order under the Administrative Procedures Act. *See Am. Vanguard Corp.*, 803 F. Supp. 2d at 14 (stating that "the fact that Congress *generally gave EPA the authority to monitor and enforce compliance with the [Act] does not absolve*" it of its obligation to ensure that the official responsible for issuance of a stop sale, use, or remove order possesses the right to take such action) (emphasis added).

The Government, nonetheless, contends that the same standards apply. Under both standards, it argues that an agency action is unauthorized if it was "either explicitly prohibited or was outside the normal scope of the government officials' duties." (*See* ECF 50 at 11 (quoting *Del-Rio Drilling Programs, Inc. v. United States*, 146 F.3d 1358, 1362 (Fed. Cir. 1998)).) As stated in our Order denying defendant's motion to dismiss, however, "government conduct is [not] 'unauthorized,' for the purposes of takings law, merely because the conduct would have been found legally erroneous if it had been challenged in court." (*See* ECF No. 23 at 2–3 (quoting *Del-Rio*, 146 F.3d at 1362).)

The Federal Circuit in *Del-Rio* stated in full that: "In a case such as this one, in which the alleged taking consists of regulatory action that deprives a property-holder of the enjoyment of property, government agents have the requisite authorization if they act within the general scope of their duties, i.e., if their actions are a natural consequence of Congressionally approved measures . . . or are pursuant to the good faith implementation of a Congressional Act." 146 F.3d at 1362 (citation and quotations omitted). The district court in *Am. Vanguard Corp.* held that the Order was illegally issued; yet, despite its excavation of internal memoranda relative to the delegation of powers in the EPA, the trial court did not explore, for instance, whether the Order was issued in good faith.

Conduct is not unauthorized for purposes of takings law merely because it is found legally erroneous in court. *Del-Rio*, 146 F.3d at 1363. There is no good reason to think that Ms. Kelley's issuance of the Order reflected anything but a good faith effort to

implement the Act. *Cf. id.* Defendant in fact argued before the district court that the Order was issued legally. In its brief before us, moreover, it stated that: "Thus, at all relevant times before the district court's judgment, the EPA officials with delegated authority were aware of, and did not object to, the issuance of the [Order]." (ECF No. 45 at 24.)

Finally, the Government maintains that judicial estoppel should bar American from pursuing a ratification theory that cannot be reconciled with its prior position. The following three elements must be satisfied to invoke the doctrine of judicial estoppel:

> First, a party's later position must be 'clearly inconsistent' with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled. Finally, [a] third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*Sharpe v. United States*, 134 Fed. Cl. 805, 815 (2017) (quoting *Cuyahoga Metro. Hous. Auth. v. United States*, 65 Fed. Cl. 534, 556 (2005)). Judicial estoppel, however, only binds a party to a position that it advocated and successfully achieved. *SkyHawke Techs., LLC v. Deca Int'l Corp.*, 828 F.3d 1373, 1376 (Fed. Cir. 2016) (finding that where agency and district court had applied a different standard of claim construction, judicial estoppel did not bar the plaintiff's claim). The standard for a claim that an action is unauthorized under the Administrative Procedures Act is different for purposes of a takings claim. We find that defendant has not established the elements of an estoppel defense and that the Order was an authorized action for purposes of a takings claim.[6]

---

[6] The Government referred to *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) and *A-1 Cigarette Vending v. United States*, 49 Fed. Cl. 345 (2001) for the proposition that a takings claim cannot rest on unauthorized agency action. In those cases, however, the Supreme Court and the Court of Claims concluded that a takings claims cannot arise from executive action that is wholly unauthorized; not whether an official in an agency had properly exercised her authority. *See Food & Drug Admin.*, 529 U.S. at 160–61 (finding that Congress had not given FDA the authority to regulate tobacco products as customarily marketed); *A-1 Cigarette Vending*, 49 Fed. Cl. at 351 (stating that "a compensable taking cannot arise from executive actions that are wholly unauthorized"). There is no dispute, here, that the EPA was generally authorized to issue stop sale, use, or removal orders.

2. Takings and Cognizable Property Interests

The Takings Clause states that "private property [shall not] be taken for public use, without just compensation." U.S. CONST. AMEND. V. The Supreme Court has drawn a distinction between physical takings and regulatory takings from the Fifth Amendment. *See Brown v. Legal Found. of Washington*, 538 U.S. 216, 233–34 (2006) (stating that the former involves application of clear rules; whereas, the latter entails complex factual assessments of the purposes and economic effects of government actions).

The analysis surrounding the issue of whether American has a cognizable property interest is central to both physical and regulatory claims. Whereas a physical taking expressly requires us to consider whether American has a "cognizable property interest" and whether the government's action constitutes a compensable taking, *Huntleigh USA Corp. v. United States*, 525 F.3d 1370, 1377–78 (Fed. Cir. 2008); the test to determine whether a regulatory taking occurred supposes a cognizable property interest is present.[7]

Properly characterizing what constitutes American's property interest is essential to our appreciation of its takings claim because not all economic interests are cognizable property rights. *United States v. Willow River Power Co.*, 324 U.S. 499, 502 (1945). Takings claims can be based on real property, tangible property, and intangible property. *Huntleigh*, 525 F.3d at 1377–78. American maintains that the EPA's Order constitutes a regulatory taking of its PCNB business, which includes *inter alia* manufacturing facilities and processes, intellectual property, distribution networks, sales, and transferable registrations and licenses. We disagree.

It is well settled "that existing rules and understandings and background principles derived from an independent source, such as state, federal, or common law, define the dimensions of the requisite property rights for the purposes of establishing a cognizable taking." *Acceptance Ins. Co., v. United States*, 583 F.3d 849, 857 (Fed. Cir. 2009) (quotation omitted); *Bair v. United States*, 515 F.3d 1323, 1329 (Fed Cir. 2008) (stating that federal statutes can constitute a "'background principle' that inhere in the title to property interests arising after its enactment, therefore precluding a takings claim based on the application of the statute to those property interest") (citations omitted)).

Together with this understanding of how to define the requisite property right, the Government maintains that plaintiff does not possess a right to exclude it from its domestic sales or transfers of pesticides (i.e., the right to sole and exclusive possession)

---

[7] The Supreme Court supplied the balancing test for determining whether a regulatory taking has occurred in *Penn Cent. Transp. Co. City of New York*, 438 U.S. 104 (1978). The Supreme Court in *Penn Cent.* examined the regulation's economic impact, the extent to which the regulation interfered with investment-backed expectations, and the nature or character of the governmental action. *Id.* at 124.

because its interest at all times was subject to a regulatory scheme that permitted the EPA to enjoin its sales of PCNB products where it had reason to believe it violated the Act. In support, defendant contends that plaintiff's claim is foreclosed, as it voluntarily entered into an area that is subject to pervasive government control. (ECF No. 45 at 29 (citing *Hearts Bluff Game Ranch, Inc. v. United States*, 669 F.3d 1326, 1330 (Fed. Cir. 2012)).

Several cases cited by defendant are distinguishable in various respects; we find, however, that plaintiff does not have a cognizable property interest in using property in a manner that EPA believes to be harmful to the public. For instance, the Government refers to *Acceptance*, which held that an insurance company did not have a property interest in selling crop insurance policies to another company. 583 F.3d at 857. Yet as American points out, though the government disapproved of the sale in *Acceptance*, the property interest at issue there were federally reinsured crop insurance policies. 583 F.3d at 857–58 (stating that by voluntarily entering into the federally regulated crop insurance program, the plaintiff relinquished its right to freely transfer policies, in exchange for the benefits of the crop insurance program).[8]

The Constitution protects rather than creates property interests. *Phillips v. Washington Legal Found.*, 524 U.S. 156, 165 (1998). Though CSFs and registrations are submitted to the EPA for approval under the Act, the Act does not *create* the right to sell pesticides. The Act, however, defines American's relation to the right, which includes how it may use, possess, and dispose of it. The evolution of the Act from a labelling law into a comprehensive regulatory statute, albeit out of a concern to protect the public, does not operate to transform the nature of the right. American devotes much of its briefs to delineating the source and nature of its right; yet, it is not clearly responsive to the claim that the sale and use of pesticides have long been the subject of government regulation.[9]

---

[8] Just as *Acceptance* is distinguishable because it involves businesses that were created by federal law, as opposed to merely regulated by it, the Government's reliance on *Hearts Buff* is similarly distinguishable. *See Hearts Buff*, 69 F.3d at 1329 (finding that plaintiff did not have a cognizable property interest in obtaining a mitigating banking instrument for a federally created wetlands mitigation banking program).

[9] The Supreme Court in *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 991–92 (1984) stated that:

> In 1970, the Department of Agriculture's [Federal Insecticide, Fungicide, and Rodenticide Act] responsibilities were transferred to the then newly created Environmental Protection Agency . . . . Because of mounting public concern about the safety of pesticides and their effect on the environment and because of a growing perception that the existing legislation was not equal to the task of safeguarding the public interest . . . Congress undertook a comprehensive

The Federal Circuit has previously determined that there is no property interest in using property in a manner that is harmful to the general public. *Mitchell Arms, Inc. v. United States*, 7 F.3d 212 (Fed. Cir. 1993). In that case, the plaintiff alleged that the government had taken its property by revoking and suspending permits to import rifles and therefore "taken" its contractual relationship with the buyer. The Federal Circuit affirmed the ruling of the trial court, which stated that:

> the interest affected by [the Bureau of Alcohol, Tobacco, and Firearms's] actions—the right to sell assault weapons in domestic commerce—is not a right inherent in plaintiff's ownership of those weapons. That right comes into being only upon the issuance of an import permit. Since however, it is Congress alone which has the power to regulate commerce with foreign nations, plaintiff does not have an enforceable right to the issuance of an import license. For that same reason then, plaintiff has no basis on which to found a taking claim.

*Id.* at 217 (citing 26 Cl. Ct. 1, 6 (1992)) (explaining that the government did not take plaintiff's rifles, rather it took its ability to realize an expectation in the ultimate market disposition of the rifles – a collateral interest incidental to plaintiff's ownership of rifles).

Plaintiff alleges that defendant took its domestic PCNB business, not the actual pesticides. The right to sell those pesticides domestically, however, is controlled entirely by EPA under the Act. Without permission from EPA, it cannot exercise its right to sell PCNB. The pesticide here is similar to the rifles in *Mitchell Arms* as the sale is closely

---

revision of [the Federal Insecticide, Fungicide, and Rodenticide Act] through the adoption of the Federal Environmental Pesticide Control Act of 1972, 86 Stat. 973. The amendments transformed [the Federal Insecticide, Fungicide, and Rodenticide Act] from a labeling law into a comprehensive regulatory statute. H.R. Rep. No. 92–511, at 1. As amended, [the Federal Insecticide, Fungicide, and Rodenticide Act] regulated the use, as well as the sale and labeling, of pesticides; regulated pesticides produced and sold in both intrastate and interstate commerce; provided for review, cancellation, and suspension of registration; and gave EPA greater enforcement authority. Congress also added a new criterion for registration: that EPA determine that the pesticide will not cause 'unreasonable adverse effects on the environment.' §§ 3(c)(5)(C) and (D), 86 Stat. 980–981.

regulated by the federal government and it *may* present a risk to the general public. *See Allied-General Nuclear Servs. v. United States*, 839 F.2d 1572, 1576 (Fed. Cir. 1988) ("[T]he basic rule that is dispositive here is that as against reasonable state regulation, no one has a legally protected right to use property in a manner that is injurious to the safety of the general public.").

Because American has no cognizable property interest in their "domestic PCNB business," we need not go any further to determine if a taking occurred. *Hearts Bluff,* 669 F.3d at 1329 (stating that where the threshold issue of whether there is a cognizable property interest is not met, the court need not consider whether a taking occurred).

## CONCLUSION

The Government's motion for summary judgment is **GRANTED**. American's cross-motion for summary judgment is **DENIED**. The Clerk of Court is directed to dismiss the complaint.

**IT IS SO ORDERED.**

s/*Robert H. Hodges, Jr.*
Robert H. Hodges, Jr.
Senior Judge